STATE OF NEBRASKA, APPELLEE, V. STEVA MAXINE BOSTWICK,
APPELLANT.

385 N.W.2d 906

Filed May 2, 1986.   Nos. 85-237, 85-238.

Thomas M. Kenney, Douglas County Public Defender, and Stanley A. Krieger, for appellant.

Robert M. Spire, Attorney General, and LeRoy W. Sievers, for appellee.

Krivosha, C.J., Boslaugh, White, Hastings, Caporale, Shanahan, and Grant, JJ.

Shanahan, J.

Steva Maxine Bostwick appeals convictions for second degree forgery and possession of a forged instrument after a jury trial in the district court for Douglas County. We affirm.

In November 1982 Bostwick entered employment as a bookkeeper for Commercial Enterprises, Ltd., a trucking company owned and managed by Gail Hammitt. Commercial is a "general commodities carrier" which, on a "strictly for-hire" basis, hauls freight throughout the continental United States. Bostwick was hired to "maintain all of [Commercial's] accounts receivable, take care of the accounts payable, keep a general ledger, keep track of expenses that [Commercial] had on each vehicle, [and] keep track of the drivers' expenses and their income." Bostwick was responsible for maintaining the check ledgers, balancing all the checking accounts, and keeping track of all canceled checks.

When Bostwick was hired, Commercial had checking accounts at First National Bank of Woodbine, Iowa, and Norwest Bank in Omaha. In February 1983, when Commercial's financial situation deteriorated, the company started borrowing significant amounts from the Woodbine bank. By the fall of 1983, Commercial's financial condition had not improved, and, on October 3, 1983, Commercial filed a Chapter XI bankruptcy.

In conjunction with the bankruptcy proceedings, Commercial opened a new checking account at First National Bank of Omaha and on October 19 ordered an initial set of check forms, numbered 1001 through 1501. On October 24 First National received a second order for the same numbered

checks for Commercial. On the day after Commercial had picked up its first set of checks, the second requested set was delivered to Commercial's office, and Bostwick, stating "she would handle it," took the second order of checks to her office.

Shortly after arrival of the second set of checks, Hammitt "received word" that Commercial "might have a problem" with its accounting. On November 2 Hammitt "started going through the books" and discovered that "the first six months of the check vouchers and all of the canceled checks" pertaining to the Norwest Bank account were missing. The next day, Hammitt confronted Bostwick about the missing checks. Bostwick claimed she had no idea what Hammitt was talking about, stated that "[y]ou are not going to hang this one on me," and "stomped out the door."

On November 4 Hammitt contacted the Douglas County Sheriff's Department and reported Bostwick had "possibly been involved in some wrongdoing in [his] business." Hammitt received a call from Officer Charles Armstrong of the Omaha Police Department on November 7, who informed Hammitt that police had "picked up a check" which was dated November 2, 1983, payable to Bostwick in the sum of $1,000 and apparently signed by Hammitt. The check, numbered 1065 and drawn on Commercial's account at the Omaha First National Bank, had been deposited in the account of Bostwick's husband, Harry. That deposit was made on November 7 by a middle-aged woman who was "similar in appearance" to Bostwick. Hammitt examined Commercial's records, learned there were duplicate checks for the Omaha First National account, and uncovered a canceled check, numbered 1065, which was signed by Hammitt's wife, Pat, and was payable to one of Commercial's drivers. Hammitt informed Officer Armstrong that there "were two sets of checks" and instructed First National to stop payment on check 1065 payable to Bostwick.

On January 5, 1984, Officers Armstrong and Darrell D. Hollingshead proceeded to Bostwick's residence to execute a warrant for Bostwick's arrest. The officers "set up a surveillance" from a police cruiser in a parking lot located across the street from Bostwick's residence and waited.

Bostwick eventually came out of her house, looked in the general direction of the police cruiser, and began running through the snow, away from the cruiser's location. Officer Hollingshead, after informing Bostwick that he was a police officer, chased Bostwick for approximately a block, apprehended her, and placed her under arrest. During that chase, Bostwick carried a purse, which Officer Hollingshead seized and turned over to Officer Armstrong, who examined the contents and found five checks "shoved in the top of the purse." The five checks were payable to Bostwick and bore Hammitt's apparent signature. Three of the checks were dated December 18, 1983, and were drawn on the Omaha First National Bank for the sums of $1,500, $900, and $300. The other two checks were dated November 3, 1983, and each was drawn on Norwest Bank for the sum of $300.

Two separate informations were filed on April 20, 1984, and charged Bostwick with second degree forgery (see Neb. Rev. Stat. § 28-603(1) (Reissue 1979)) and possession of a forged instrument (see Neb. Rev. Stat. § 28-604(1) (Reissue 1979)). Each information also alleged Bostwick was a habitual criminal (see Neb. Rev. Stat. § 29-2221 (Reissue 1979)), referring to Bostwick's prior convictions for forgery and grand larceny. The State proceeded on the informations in a consolidated trial.

The State had retained Patrick Bolan, a "questioned document examiner" with extensive experience in analyzing handwriting. To provide Bolan with a sample of Bostwick's handwriting, Officer Armstrong visited Bostwick on June 28 and requested that she fill out the standard Omaha Police Department handwriting exemplar. The exemplar contained the words "Omaha Police Division Handwriting Exemplar" at the top of the document and indicated the date on which the exemplar was given. Bostwick agreed to fill out one exemplar, but when asked pursuant to police standard practice to complete another, stated: "Well, you· have lots of my handwriting. One is all I'm going to fill out."

Before her trial on September 11, 1984, Bostwick filed a motion in limine to exclude evidence of her prior convictions for forgery and grand larceny. The district court sustained Bostwick's motion regarding her 1968 conviction for forgery

but overruled the motion pertaining to Bostwick's 1975 and 1976 convictions for grand larceny. After a jury had been empaneled, sworn, and some State's witnesses had testified and touched upon Bostwick's prior activities, the court reversed itself and sustained Bostwick's motion in limine in its entirety concerning exclusion of all prior convictions. On Bostwick's motion the court declared a mistrial.

Bostwick's second trial commenced on October 15, 1984. The jury began deliberating on October 19 and continued deliberation on October 22, 23, and 24. At 12:28 p.m. on October 25, the jury informed the court that a verdict could not be reached and asked to be discharged. Notwithstanding the court's instruction for further deliberation, the jury, approximately 2 hours later, again indicated that there was a "hopeless deadlock." The court declared a mistrial and discharged the jury.

On January 8, 1985, the State embarked upon a third trial of Bostwick. Before trial Bostwick had moved to dismiss the action on the ground that a third trial violated Bostwick's constitutional right against double jeopardy. The district court overruled Bostwick's motion, finding "that no misconduct on the part of the State caused the mistrial in this case on either occasion."

In the third trial the State called Hammitt, who testified that he had not signed the checks in question and had never authorized Bostwick to sign company checks. Hammitt also testified that Commercial's financial problems were tied to Bostwick's employment, noting: "Prior to Mrs. Bostwick coming to work for me, I really hadn't had any financial problems other than what you would have in a normal business." Hammitt's testimony was generally corroborated by other personnel from Commercial.

The State then called Patrick Bolan, who expressed his "conclusive opinion" that Hammitt had not signed the checks in question and that Bostwick had endorsed her name on the back of the check deposited in her husband's account on November 7. Bolan relied on five handwriting exemplars given by Bostwick to the police in 1975, the exemplar Bostwick provided Officer Armstrong in 1984, and Bostwick's entries on

Commercial's check ledger. Bostwick objected to the admission of the 1975 handwriting exemplars, contending that receipt of those exemplars as evidence would "emasculate" the trial court's previous ruling in the September 11 trial, excluding Bostwick's 1975 and 1976 convictions for grand larceny. During his testimony, Bolan emphasized the importance of having "enough known writing to be compared" and noted that an adult's handwriting remains "pretty much" unchanged by time. Bolan further testified that the 1984 exemplar Bostwick gave to Officer Armstrong contained "grotesque letter formations," indicating an "intentional distortion" in the exemplar. The format of the 1975 exemplars was similar but not identical to the 1984 exemplar. Printed type in the preprinted 1975 forms was different from the 1984 printed form for the exemplar. Although the 1975 forms did not indicate any relationship to any criminal activity under investigation and were not labeled or identified as a police department form, the 1975 completed exemplars were countersigned by a "Sgt. A. Temin." The 1975 exemplars did recite that Bostwick was then employed as an "accountant" for "G & T Drywall, Inc." The district court overruled Bostwick's objection, stating that the exemplars were "of sufficient probative value that they outweigh any prejudice that they might create." Based on all handwriting samples from Bostwick, Bolan concluded that Bostwick had, "within a very high degree of probability," forged Hammitt's name on the checks involved in prosecution of Bostwick.

Bostwick's defense rested on the theory that Commercial had never been financially sound, that Hammitt had engaged in improper financial practices to keep Commercial solvent, and that, after the bankruptcy, Hammitt had used Bostwick as a "scapegoat" for Commercial's financial problems. During cross-examination of Hammitt, Bostwick introduced numerous balance sheets and income statements of Commercial for the year 1982, all suggesting that Commercial had been suffering from serious cash-flow problems before Bostwick's employment with Commercial. Specifically, the balance sheets reflected deficits as large as $22,000, while income statements showed net losses as great as $17,000. Bostwick also introduced 11 overdraft notices sent to

Commercial by the Woodbine bank for checks drawn in the summer of 1983 for amounts ranging from $62.80 to $18,743.80. In response to evidence regarding Commercial's financial situation, Hammitt noted that all the overdrafts had been paid and pointed his finger at Bostwick, stating: "I didn't have any cash flow problems until I hired Steva Bostwick." During cross-examination of Hammitt, the following occurred:

> Q [Bostwick's counsel] Mr. Hammitt, you have talked to us all day long about the cash flow problems that you were experiencing during the year of 1983, is that correct?
>
> A Yes, but I didn't have any cash flow problems until I hired Steva Bostwick.
>
> Q None whatsoever?
>
> A None that I couldn't handle; none that I wasn't handling quite well.
>
> Q Okay, she is responsible for everything that happened to your company, is that what you are saying?
>
> A I am saying that she is responsible for all of the cash flor [sic] problems I had in 1983. When somebody takes $50,000.00 out of your account and you don't know about it, it is pretty hard to get a cash flow.

Bostwick immediately objected, requested that Hammitt's answer be stricken, and moved for a mistrial. The court overruled the motion for a mistrial, noting that "the defense in this case is that Mr. Hammitt has gotten himself into trouble with overexpansion in whatever form or manner and it is quite obvious to the jury and everybody else that we are talking about more than $2,500." The court instructed the jury to "disregard the last part of [Hammitt's] response."

Bostwick also called Allan Eich, a vice president of the Woodbine bank, who testified about Commercial's financial difficulties and suggested that Commercial may have engaged in some suspect financial practices to avoid payments to that bank. On cross-examination Eich testified that Commercial's serious financial problems had not developed before Bostwick's employment, and noted that, during the summer of 1983, he had informed Hammitt concerning a possible "leak in his business."

Finally, Bostwick, testifying in her own behalf, stated that

the checks in question were given as payment of Bostwick's disputed claim for back wages and overtime. According to Bostwick, all checks were signed by Hammitt. During cross-examination, Bostwick admitted that she had twice been convicted of a felony punishable by imprisonment in excess of 1 year. See Neb. Evid. R. 609(1)(a) (Neb. Rev. Stat. § 27-609(1)(a) (Reissue 1979)).

In its instruction to the jury on the issue of reasonable doubt, the court employed NJI 14.08, which provides in pertinent part that the jury "may find an accused guilty upon the strong probabilities of the case, provided such probabilities are strong enough to exclude any doubt of his guilt that is reasonable." Bostwick objected to the instruction on the ground that it "lessens the burden of proof which the Constitution has placed upon the State." The jury returned a verdict of guilty on both charges, and the district court, after holding an enhancement hearing pursuant to § 29-2221, regarding punishment of a habitual criminal, sentenced Bostwick to imprisonment for concurrent terms of 15 to 25 years.

Bostwick claims the district court erred in (1) admitting the 1975 handwriting exemplars as evidence, (2) refusing to grant Bostwick's motion for a mistrial on account of Hammitt's response on cross-examination, (3) failing to dismiss the informations for the reason that Bostwick was being placed in jeopardy twice for the same offense, and (4) overruling Bostwick's objection to the court's jury instruction pertaining to reasonable doubt.

Regarding Bostwick's first assignment of error concerning admissibility of the 1975 handwriting exemplars in conjunction with Bolan's opinion concerning forgery of the questioned checks, Bostwick contends, in the light of her testimony that she had been twice convicted of a felony, reception of the 1975 handwriting exemplars indicating her occupation as an accountant raised "a rather obvious implication that those convictions were for similar forgery or embezzlement charges and that the handwriting exemplars given in 1975 arose out of those incidents." Although conceding that the exemplars "may have been relevant" for an analysis of her handwriting, Bostwick argues that admitting the exemplars "emasculated

[the court's] prior ruling in refusing to admit testimony or evidence of other crimes" and "clearly prevented [her] from having a fair trial."

"Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Neb. Evid. R. 401 (Neb. Rev. Stat. § 27-401 (Reissue 1979)). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Neb. Evid. R. 403 (Neb. Rev. Stat. § 27-403 (Reissue 1979)). "The admission or exclusion of evidence is a matter left largely to the sound discretion of the trial court, and its ruling will be upheld absent an abuse of discretion." *State v. Norfolk*, 221 Neb. 810, 822, 381 N.W.2d 120, 129 (1986).

"Probative value is a relative concept; the probative value of a piece of evidence involves a measurement of the degree to which the evidence persuades the trier of fact that the particular fact exists and the distance of the particular fact from the ultimate issues of the case." Dolan, *The Prejudice Rule in Evidence*, 49 S. Cal. L. Rev. 220, 233 (1976). In assessing the probative value of evidence claimed by a criminal defendant to be prejudicial, courts have often focused on the prosecutor's need for the evidence, noting that "[w]hen the government has ample evidence to establish an element of the crime, the probative value of the [potentially prejudicial] evidence is greatly reduced . . . ." *United States v. Dolliole*, 597 F.2d 102, 106 (7th Cir. 1979). See, also, *United States v. Check*, 582 F.2d 668 (2d Cir. 1978); *United States v. Spletzer*, 535 F.2d 950 (5th Cir. 1976). "[W]hile prosecutorial need alone does not mean probative value outweighs prejudice . . . the more essential the evidence, the greater its probative value, and the less likely that a trial court should order the evidence excluded." *United States v. King*, 713 F.2d 627, 631 (11th Cir. 1983).

In the present case Bolan's testimony was obviously crucial in establishing the ultimate fact to be proved by the State, namely, Bostwick had forged Hammitt's name on the checks. The

record discloses, moreover, that the five 1975 exemplars were very important, if not essential, to Bolan's testimony. Bolan noted the need for having as many handwriting samples as possible and indicated how a person's handwriting remained constant notwithstanding passage of time. Although asked prior to trial to provide two handwriting exemplars, Bostwick prepared only one, which, according to Bolan, contained "grotesque letter formations" suggesting an "intentional distortion." Without the 1975 exemplars, Bolan would have had to base his opinion solely on Bostwick's entries in Commercial's check ledger. Under such circumstances the district court could legitimately conclude that the prosecutorial need for the exemplars was great and, thus, that the exemplars possessed significant probative value. With respect to possible prejudice from the admission of the 1975 exemplars, such 1975 forms were not specifically identified as police department exemplars. The State, in introducing the exemplars, made no reference to their being part of any prior criminal investigation of Bostwick or any other person. Although individual members of the jury may have perceived a connection between Bostwick's statement on cross-examination that she had twice been convicted of a felony and the 1975 exemplars, the "responsibility for maintaining the delicate balance between the probative and prejudicial effect of evidence lies largely within the discretion of the trial court." *State v. Hitt*, 207 Neb. 746, 748, 301 N.W.2d 96, 99 (1981). Under the facts of this case, we conclude that the district court did not abuse its discretion in determining that possible prejudice to Bostwick did not substantially outweigh the 1975 exemplars' high probative value.

Bostwick next argues Hammitt's response on cross-examination, that Bostwick may have removed $50,000 from Commercial's accounts, was "unduly prejudicial" and that the district court's refusal to grant a mistrial "was an abuse of discretion."

A mistrial results in nullification of a pending jury trial. In order to prevent defeat of justice or to further justice during a jury trial, a mistrial is generally granted at the occurrence of a fundamental failure preventing a fair trial

in the adversarial process. Some examples are an egregiously prejudicial statement by counsel, the improper admission of prejudicial evidence, or the introduction of incompetent matters to the jury, to the extent that any damaging effect cannot be removed by proper admonition or instruction to the jury.

*State v. Archbold,* 217 Neb. 345, 351, 350 N.W.2d 500, 504 (1984). "A motion for a mistrial is addressed to the sound discretion of the trial court, and its ruling will not be disturbed in the absence of a showing of an abuse of discretion." *State v. Ammons,* 208 Neb. 812, 813, 305 N.W.2d 812, 814 (1981).

In assessing Hammitt's testimony on cross-examination, such testimony must be placed in the context of all the evidence adduced by the parties concerning Commercial's financial condition. The cornerstone of Bostwick's defense was Commercial's serious financial problems before Bostwick entered employment with Commercial in November 1982. To demonstrate that point, Bostwick introduced balance sheets and income statements from 1982 indicating that Commercial was operating at a significant deficit. The State, in turn, attempted to show that Commercial's financial difficulties were directly related to Bostwick's employment. Allan Eich testified, without objection, that he had informed Hammitt during the summer of 1983 of a possible "leak" in Commercial's finances. Prior to his remark about the $50,000, Hammitt had stated, without objection, that Commercial had no cash-flow problems until he "hired Steva Bostwick" and that she was responsible for "all of the cash flow problems" Commercial had in 1983. The jury, moreover, was aware of the missing checks which precipitated Hammitt's confrontation with Bostwick on November 2. In the light of such evidence, the jury could hardly be surprised to hear that Hammitt held Bostwick responsible for appropriating a significant sum of money during her employment with Commercial.

Bostwick had opened the door for evidence regarding the source and extent of Commercial's financial problem. Although Hammitt's suggestion that Bostwick appropriated $50,000 is unsubstantiated, in the context of all evidence existing when Hammitt made such suggestion, the prejudice

resulting was slight when considered with the other evidence tending to show Bostwick's culpability for Commercial's financial woes. The district court sustained Bostwick's motion to strike the suggestive part of Hammitt's testimony and admonished the jury to disregard that testimony. Under the facts of this case, we find no abuse of discretion in the district court's judgment that such instruction and admonition removed the damaging effect, if any, from Hammitt's testimony.

Bostwick also maintains that she was "placed in jeopardy twice for the same offense" in violation of the double jeopardy clause of the fifth amendment to the U.S. Constitution and article I, § 12, of the Nebraska Constitution.

As a general principle, the constitutional prohibition against double jeopardy protects "an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense." *Green v. United States*, 355 U.S. 184, 187, 78 S. Ct. 221, 2 L. Ed. 2d 199 (1957). "The double-jeopardy provision of the Fifth Amendment, however, does not mean that every time a defendant is put to trial before a competent tribunal he is entitled to go free if the trial fails to end in a final judgment." *Wade v. Hunter*, 336 U.S. 684, 688, 69 S. Ct. 834, 93 L. Ed. 974 (1949). In a given case the constitutional double jeopardy clause bars only a retrial in a criminal prosecution where (1) jeopardy has attached in a prior criminal proceeding (see *Illinois v. Somerville*, 410 U.S. 458, 93 S. Ct. 1066, 35 L. Ed. 2d 425 (1973)); (2) the defendant is being retried for the same offense prosecuted in that prior proceeding (see *Brown v. Ohio*, 432 U.S. 161, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977)); and (3) the prior proceeding has terminated jeopardy (see *Justices of Boston Municipal Court v. Lydon*, 466 U.S. 294, 104 S. Ct. 1805, 80 L. Ed. 2d 311 (1984)). In a case tried to a jury, jeopardy attaches when the jury is empaneled and sworn. See *Illinois v. Somerville, supra*. Obvious examples of events triggering termination and, thus, precluding reprosecution include (1) an acquittal by a jury or by a trial judge sitting as a fact finder (see *Arizona v. Washington*, 434 U.S. 497, 98 S. Ct. 824, 54 L. Ed. 2d 717 (1978)); (2) a directed verdict of acquittal by the trial judge for insufficient evidence (see *Hudson v.*

*Louisiana,* 450 U.S. 40, 101 S. Ct. 970, 67 L. Ed. 2d 30 (1981));
and (3) a conviction reversed, as a matter of law, for
insufficient evidence to support the conviction (see *Burks v.
United States,* 437 U.S. 1, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978)).
A declaration of mistrial, on the other hand, does not, in every
case, result in termination of jeopardy. Although a defendant
has a "valued right to have his trial completed by a particular
tribunal," such right "must in some instance be subordinated to
the public's interest in fair trials designed to end in just
judgments." *Wade v. Hunter, supra* at 689.

In the present case there is no question that jeopardy
attached in each of the three prosecutions against Bostwick. As
a result of the third prosecution, Bostwick was being tried for
the same offenses for which she had been previously placed in
jeopardy. The precise issue raised by Bostwick is whether
jeopardy had terminated in either of the two prior
prosecutions, thus triggering the constitutional prohibition
against double jeopardy.

Bostwick's first trial ended when the district court, during
trial, reversed its position on admissibility of evidence
regarding Bostwick's prior convictions and granted Bostwick's
motion for a mistrial. In *State v. Munn,* 212 Neb. 265, 266-67,
322 N.W.2d 429, 431 (1982), this court stated:

> "Prosecutorial conduct that might be viewed as
> harassment or overreaching, even if sufficient to justify a
> mistrial on defendant's motion . . . does not bar retrial
> absent intent on the part of the prosecutor to subvert the
> protections afforded by the Double Jeopardy Clause. A
> defendant's motion for a mistrial constitutes 'a deliberate
> election on his part to forego his valued right to have his
> guilt or innocence determined before the first trier of fact.'
> . . . Only where the governmental conduct in question is
> intended to 'goad' the defendant into moving for a
> mistrial may a defendant raise the bar of double jeopardy
> to a second trial after having succeeded in aborting the
> first on his own motion." [Quoting *Oregon v. Kennedy,*
> 456 U.S. 667, 102 S. Ct. 2083, 72 L. Ed. 2d 416 (1982).]

Although Bostwick claims that the mistrial in the first
prosecution resulted from prosecutorial "overreaching," the

record discloses only that the State sought to introduce evidence of Bostwick's prior convictions pursuant to Neb. Evid. R. 404 (admissibility of evidence regarding character, trait, or other crimes, wrongs, or acts) (Neb. Rev. Stat. § 27-404 (Reissue 1979)). In Bostwick's first trial the district court had initially denied Bostwick's motion in limine and allowed admission of the evidence, but after some State witnesses had testified about Bostwick's prior activities, the trial court reversed its position and ruled that evidence of Bostwick's prior convictions was inadmissible. The circumstances surrounding the mistrial in the first prosecution are hardly sufficient to establish prosecutorial intent designed to goad Bostwick into moving for a mistrial. Assuming the district court initially erred in deciding to admit evidence of Bostwick's prior convictions, generally "a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error." *United States v. Jorn*, 400 U.S. 470, 485, 91 S. Ct. 547, 27 L. Ed. 2d 543 (1971). Based on the first trial, Bostwick's double jeopardy claim has no support in the record.

Bostwick's second trial ended in a mistrial when the jury was unable to reach a verdict. As early as 1824, the U.S. Supreme Court, in examining the boundaries of the double jeopardy clause, recognized that a jury's inability to reach a verdict does not, itself, preclude a subsequent prosecution for the same offense. See *The United States v. Perez*, 22 U.S. 194 (9 Wheat. 579), 6 L. Ed. 165 (1824). "[W]ithout exception, the courts have [adhered to *Perez* and] held that the trial judge may discharge a generally deadlocked jury and require the defendant to submit to a second trial." *Arizona v. Washington*, 434 U.S. 497, 509, 98 S. Ct. 824, 54 L. Ed 2d 717 (1978). "The Government, like the defendant, is entitled to resolution of the case by verdict from the jury, and jeopardy does not terminate when the jury is discharged because it is unable to agree." *Richardson v. United States,* 468 U.S. 317, 326, 104 S. Ct. 3081, 82 L. Ed. 2d 242 (1984). So long as a trial court has not abused its discretion in determining that a jury is deadlocked, a declaration of mistrial resulting from a jury's inability to reach a verdict does not bar reprosecution under the double jeopardy

clause of the fifth amendment. See, *United States v. Ellis*, 646 F.2d 132 (4th Cir. 1981); *Arnold v. McCarthy*, 566 F.2d 1377 (9th Cir. 1978); *Ex parte Anderson*, 457 So. 2d 435 (Ala. App. 1984).

The applicable criteria to determine whether a trial court has abused its discretion in declaring a jury deadlocked are found in the answer to the question: Is there a "manifest necessity" for discharging the jury? See *United States v. Horn*, 583 F.2d 1124 (10th Cir. 1978); cf. *United States v. Perez, supra*. In *Arizona v. Washington, supra*, the U.S. Supreme Court discussed the deference accorded a trial court's decision to discharge a deadlocked jury:

> Moreover, in this situation there are especially compelling reasons for allowing the trial judge to exercise broad discretion in deciding whether or not "manifest necessity" justifies a discharge of the jury. On the one hand, if he discharges the jury when further deliberations may produce a fair verdict, the defendant is deprived of his "valued right to have his trial completed by a particular tribunal." But if he fails to discharge a jury which is unable to reach a verdict after protracted and exhausting deliberations, there exists a significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors. If retrial of the defendant were barred whenever an appellate court views the "necessity" for a mistrial differently from the trial judge, there would be a danger that the latter, cognizant of the serious societal consequences of an erroneous ruling, would employ coercive means to break the apparent deadlock. Such a rule would frustrate the public interest in just judgments. The trial judge's decision to declare a mistrial when he considers the jury deadlocked is therefore accorded great deference by a reviewing court.

434 U.S. at 509-10.

In *Arnold v. McCarthy, supra*, the Ninth Circuit Court of Appeals suggested several factors or considerations

> useful in determining whether a judge has properly exercised his discretion to declare a deadlocked jury. . . .

> (1) a timely objection by defendant, (2) the jury's collective opinion that it cannot agree, (3) the length of the deliberations of the jury, (4) the length of the trial, (5) the complexity of the issues presented to the jury, (6) any proper communications which the judge has had with the jury, and (7) the effects of possible exhaustion and the impact which coercion of further deliberations might have on the verdict.

566 F.2d at 1386-87. The court concluded that "[t]he most critical factor is the jury's own statement that it was unable to reach a verdict." 566 F.2d at 1387. See, also, *United States v. Cawley*, 630 F.2d 1345 (9th Cir. 1980); *United States v. Horn, supra*.

Bostwick, although generally contending that double jeopardy terminated in the second prosecution, makes no specific claim regarding the propriety of the district court's decision to discharge the jury. In any event, the record establishes that the jury deliberated almost 5 days before informing the court about the jury's impasse; that the court consulted with individual members of the jury and requested the jury to deliberate further; and that, when the jury was still unable to reach a verdict, the court again spoke with individual jurors, all of whom informed the court that they were unable to reach a verdict. Under the circumstances of this case, the court properly discharged the jury without prejudice to the State's retrial and continued prosecution of Bostwick in a subsequent proceeding. Bostwick's double jeopardy claim, based on the double jeopardy provisions of the state and federal Constitutions, is without merit.

Finally, Bostwick challenges the trial court's utilization of NJI 14.08, contending that the instruction "does not fairly and accurately convey the meaning of reasonable doubt." In *State v. Beard,* 221 Neb. 891, 897, 381 N.W.2d 170, 174 (1986), we recently rejected the identical claim that such instruction " 'unconstitutionally weaken[s] the burden of proof placed on the prosecution.' " For the reasons given in *State v. Beard, supra*, we conclude there is no error in the instruction given by the trial court on the issue of reasonable doubt.

The judgment of the district court is correct in all respects and is, therefore, affirmed.

AFFIRMED.