IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. CARTWRIGHT


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

RICKEY R. CARTWRIGHT, APPELLANT.


Filed April 8, 2025.    No. A-24-295.


Appeal from the District Court for Douglas County: MOLLY B. KEANE, Judge. Reversed and remanded for a new trial.

Theodore C. Turnblacer, Jr., of Dornan, Troia, Howard, Breitkreutz, Dahlquist & Klein, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and P. Christian Adamski for appellee.


MOORE, BISHOP, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Rickey R. Cartwright appeals from his jury conviction for third degree sexual assault of a child. Cartwright asserts that the Douglas County District Court erred in admitting during trial evidence of other bad acts and the forensic interview of the 5-year-old victim. For the reasons stated herein, we reverse and remand for a new trial.

## II. STATEMENT OF FACTS

On August 18, 2022, the 5-year-old victim disclosed to her mother, Kia R., that Cartwright, who was the victim's biological father, had sexually abused her. Kia reported the alleged assault to law enforcement the following month. The victim underwent a forensic interview during which she disclosed that her "dad" "pulled my pants down, and he was pulling his pants down"; "he was

- 1 -

pulling his private part"; "you know when you suck your thumb? Yeah, he wanted me to do that to his private part"; and that after he told her to suck on his private part, "I was holding it . . . and I pulled my mouth back. . . and so he pulled his pants back up." The victim denied that his private part touched her anywhere else. During the medical examination that followed, the victim when asked if anyone had touched her "private part," responded by saying "Yep. My dad. And he be squeezing my booty" and that her dad used his hands to touch her private part. The victim denied that anyone made her touch their private part. Cartwright was eventually arrested and charged with first degree sexual assault of a child, a Class IB felony, and third degree sexual assault of a child, a Class IIIA felony. Although he was also initially charged with incest, the State dismissed that charge prior to Cartwright's trial.

1. PRETRIAL MOTIONS FILED BY CARTWRIGHT

Prior to trial, Cartwright filed motions in limine in which he sought to exclude evidence including the video of the forensic interview of the victim and any testimony related to other acts of misconduct by Cartwright against Aimire R., the victim's brother. The State separately filed its own motion in limine. Following a hearing on the motions, the district court held the ruling as to the admissibility of the forensic interview in abeyance until trial. During the hearing on the motion in limine regarding the prior acts evidence, Cartwright's counsel argued that

> during that conversation there, it came to light that [the victim] was making allegations against [Cartwright] and then also during that conversation that Aimire made an allegation that he saw [Cartwright] with [L.B., who was the daughter of Cartwright's girlfriend]. And after Aimire included that in the conversation, the State alleges that [Cartwright] had a physical reaction that included assaultive behavior towards Aimire.
>
> . . . .
>
> So the defense believes that that reaction was in response to the allegation that [Cartwright] was . . . involved with inappropriate contact with [L.B.]. Judge, that allegation was part of this investigation. That allegation did not result in a criminal charge, and . . . it's not relevant to the conduct that he's charged with against [the victim]. So I think that . . . by allowing the State to elicit evidence of this physical response, it begs the question . . . what was the response to? And that response was to Aimire making an allegation that [Cartwright] was inappropriate with [L.B.]

As to the motion concerning other acts of misconduct, the district court found that the specific evidence outlined in the State's Motion in Limine regarding Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2024) was admissible "to the extent outlined in the State's Motion only." The court's order stated:

> Specifically, the State may adduce evidence and testimony that after the named victim disclosed to [Kia] that [Cartwright] was sexually assaulting her, [Kia] confronted [Cartwright] about the accusations while in the presence of [Aimire]. When [Cartwright] was confronted, [Aimire] made statements, and [Cartwright] physically assaulted and threatened [Aimire]. The Court finds that this particular evidence is inextricably intertwined with the circumstances making up the underlying allegations and is admissible

under Neb. Rev. Stat. § 27-404(2). No evidence of the particular statements made by [Aimire] prior to the physical altercation shall be elicited and no reference to any other allegations of sexual abuse by [Cartwright] on any other child shall be admitted. The evidence that the Court has deemed admissible may be used for the limited purposes of showing identity, [Cartwright's] knowledge of the allegations, and the state of mind of [Cartwright]. Any other bad acts, outside the circumstances of the altercation at the time of the confrontation regarding the alleged victim's disclosure, are inadmissible. Moreover, any statements made by [Aimire] to others describing this incident, such as statements to Project Harmony employees, will be subject to the rules of evidence and hearsay before being deemed admissible.

## 2. TRIAL

The trial was held over 5 days in February 2024. Testimony was adduced from witnesses including Kia, the victim's mother; Aimire, the victim's brother; the victim; Amy Eckstrom, the forensic interviewer who completed a forensic interview of the victim; Emma Wright, the nurse practitioner who completed a medical examination of the victim; and Monique Tebo, Cartwright's girlfriend.

During the trial, the victim, Kia, and Aimire all testified that the victim referred to both Kia's ex-boyfriend Osvail Brown and Cartwright as "dad" and that the victim referred to a man nicknamed "Book" as her "god[-]dad." Testimony was received that the victim had sometimes confused the three men with each other, and the victim admitted during her trial testimony that she used to get Brown and Cartwright mixed up and would also mix up Cartwright and "Book."

### (a) Kia R.'s Testimony

Kia testified that she and Cartwright dated on and off for 1½ to 2 years but their relationship ended in 2013 when Aimire was 1 year old. She stated that on Aimire's birthday in 2016, she and Cartwright were together resulting in her becoming pregnant with the victim. Kia described her relationship with Cartwright as "toxic" and filled with tension, that Cartwright was only in Aimire's life "whenever it was convenient," and that she did not want Cartwright's name on Aimire's birth certificate. She further testified that she and Cartwright had no formal custody arrangement.

According to Kia, she and Cartwright were not in a relationship when the victim was born and, at that time, she was dating Brown. Despite knowing that Brown was not the victim's father, Kia allowed Brown to sign the birth certificate identifying himself as the victim's father. However, after the victim turned 3 years old, Kia informed the victim that Cartwright was her father. Thereafter, during parenting time with Aimire, Kia would allow Cartwright parenting time with the victim. Kia testified that the visits were sporadic, occurring maybe once or twice per month. She also testified that, although she and Cartwright would agree that Cartwright could have the children for the weekend, Cartwright would keep them longer causing "issue[s] with me getting [the children] back" and causing feelings of anger and frustration because Cartwright would not

tell her his address stating "you're not allowed to know where I live at because you're not about to ruin my relationship."

According to Kia, after the victim's disclosure of sexual abuse in August 2022, she confronted Cartwright about the allegations. The confrontation took place in Kia's home, and she was accompanied by Aimire and the victim. During that confrontation, Aimire described the substance of the victim's sexual assault allegation without specifying whether his allegation involved the victim, L.B., or both. Kia described Cartwright's reaction as "angry shock" and "argumentative." She then described that Cartwright "grabbed" and "hit" Aimire and "threw [Aimire] on the couch." Kia also stated that Cartwright told Aimire that "if you ever tell anyone else that, I will kill you."

### (b) Aimire R.'s Testimony

Aimire testified that he had visits with Cartwright who was his father. Aimire testified that he and the victim spent the night at the house that Cartwright had recently moved into "only like twice" and that his half-siblings were there. He also testified that he was not allowed in the basement, but the victim and his other younger sister were allowed in the basement. He testified that Cartwright had two cameras in the house--one upstairs and one downstairs--and that Cartwright could see what was going on upstairs and talk through the cameras.

Aimire testified that the victim told him about what happened when she would go downstairs but he did not initially believe her "[b]ecause, like, normally she be lying." However, he stated that "the third time she told me . . . she put it in, like a serious voice." Aimire testified that, after he told Kia, she "thought I was lying, and I told her that . . . I thought my sister was lying too. And then that was when [the victim ran] in there and [told] her . . . what happened." Without providing any specificity to what Aimire disclosed to Cartwright which led to Cartwright's reaction, Aimire corroborated Kia's testimony regarding her confrontation with Cartwright stating that Cartwright became angry, "jumped . . . off the ottoman and then, like, picked me up and then punched me and threw me onto the couch and then . . . walked out the house."

### (c) Victim's Trial Testimony

The victim testified that, during visits to Cartwright's home, she shared an upstairs bedroom with L.B. and that Cartwright's bedroom was in the basement. According to the victim, children were not allowed in the basement but that sometimes Cartwright allowed her to go to the basement because the rules were different for her and that Cartwright told her "[d]on't tell nobody" about why she could go downstairs but other children could not. The victim testified that Cartwright had two cameras in the house, one of which was in his basement bedroom. The victim testified that Cartwright told her he did not want her to tell anybody that "he touched my private" which she identified as her vagina and that he did not touch her anywhere else on her body. The victim testified that Cartwright touched her when she was in the basement and there was a couch in the basement, but she provided conflicting testimony on whether the assaults occurred on 1 day or over multiple days and whether Cartwright touched her over or under her clothes. The victim testified that she told Kia about what happened because "[Cartwright] did something important to

me." The victim testified that Kia, Aimire, and her sister have supported her and helped her remember. The victim acknowledged that she used to get Brown and Cartwright mixed up and would also mix up Cartwright and "Book."

In deposition testimony which was read into the record during trial for purposes of impeachment, the victim testified that "Book" touched her private parts and "[kept] doing nasty stuff to me" and that Cartwright never touched her private part. The victim acknowledged that her testimony about Cartwright had changed between the time that she gave her deposition and the time of trial. Evidence was received that "Book," who was Kia's family friend, stayed the night at Kia's house on at least two occasions and slept in the basement. Although Kia testified that the children were not allowed in the basement, Aimire testified that sometimes the victim was alone in the basement with "Book." Despite the inconsistencies in her trial and deposition testimony, the victim testified at trial that she told the truth during her deposition and at trial even though her testimony had changed. She further admitted that she thought someone would be upset with her if she came into court and testified that Cartwright did not touch her.

### (d) Forensic Interview of Victim

Eckstrom testified that after receiving a referral from law enforcement and child protective services, she completed a forensic interview of the victim on September 19, 2022. Eckstrom testified that one of the purposes of the forensic interview is to guide medical treatment by helping the medical provider understand if they need to ask additional questions or need to do additional testing. Eckstrom testified that the 5-year-old victim appeared developmentally age appropriate. Eckstrom testified that she completed the forensic interview in compliance with her training and that the forensic interview, which was received into evidence during the trial, was an accurate representation of the victim's interview.

### (e) Medical Examination of Victim

Following the victim's forensic interview, Wright received information, including an account of the assault of the victim and the name of the perpetrator, and testified that she relied on that information in conducting the medical examination of the victim. Wright testified that she relied on statements made by the victim during the medical examination in determining the course of her examination and treatment and diagnosis of the victim. She testified that the name of the perpetrator is important for a multitude of reasons including the safety of the victim, treatment plans, diagnosis, and discharge plans. Wright testified that, during the medical examination, when she asked the victim about Cartwright, the victim stated that she was "scared" but told Wright that "my dad was pulling my pants down" and, after he did so:

> "He was doing this to me"; and she stood up and made, like, hip-thrusting, humping motions with her hips.
>
> . . . .
>
> After that I pointed to the vaginal area and asked her what she called that part on her body; and she said, "private part." I then asked her if someone has done touching to her private part; and she said, "Yep, my dad. And he be squeezing my booty. He [was] rubbing

it and squeezing it" and then started to rub her upper thighs and her buttocks with open palms.

Wright testified that the victim told her that her dad's name was Rickey, that he touched her private part with his hand on the inside, and that "[h]e pull[ed] my pants down and touch[ed] it." Wright testified that she did not observe any injuries on the victim which is the typical expectation due to the nature of vaginal tissue injuries. Following the medical examination, Wright recommended that the victim begin trauma-informed therapy and follow up with her primary doctor as needed.

### (f) Monique Tebo Testimony

Tebo testified that she and Cartwright started dating in 2018 and, at some point during the relationship, they began living together in an apartment. However, after the birth of their youngest son on August 12, 2022, she and Cartwright moved into a house. The signed lease agreement was offered and received into evidence during the trial. Although Tebo testified that between August 12 and 18, the victim had not visited or stayed the night, she also testified that the children came over on August 12 and stayed 2 days.

### 3. JURY VERDICT AND SENTENCING

The jury found Cartwright guilty of third degree sexual assault of a child and not guilty of first degree sexual assault of a child. The district court sentenced Cartwright to 3 years' imprisonment and 18 months of post-release supervision with credit for 520 days previously served. Cartwright now timely appeals and is represented by the same counsel that represented him during his trial and sentencing.

### III. ASSIGNMENTS OF ERROR

Cartwright assigns that the district court erred in (1) receiving evidence of other wrongs or bad acts in violation of Neb. Rev. Stat. § 27-403 (Reissue 2016) and (2) admitting into evidence the video-recorded forensic interview of the victim which contained hearsay statements.

### IV. STANDARD OF REVIEW

A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion. *State v. Rush*, 317 Neb. 622, 11 N.W.3d 394 (2024).

In proceedings where the Nebraska evidence rules apply, the admissibility of evidence is controlled by the Nebraska evidence rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. *State v. Vigil*, 283 Neb. 129, 810 N.W.2d 687 (2012). Where the Nebraska evidence rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion. *Id*.

Apart from rulings under the residual hearsay exception, we will review for clear error the factual findings underpinning a trial court's hearsay ruling and review de novo the court's ultimate

determination whether the court admitted evidence over a hearsay objection or excluded evidence on hearsay grounds. *Id*.

A trial court exercises its discretion in determining whether evidence is relevant and whether its probative value is outweighed by its prejudicial effect. *State v. Bauldwin*, 283 Neb. 678, 811 N.W.2d 267 (2012). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Tvrdy*, 315 Neb. 756, 1 N.W.3d 479 (2024).

## V. ANALYSIS

### 1. PRIOR BAD ACTS

Cartwright first contends that the district court erred in receiving evidence of Cartwright's physical assault of Aimire following Aimire's accusation of sexual assault because the evidence was received in violation of § 27-403. Cartwright argues that his reaction was of limited probative value and the reaction itself was misleading to the jury.

Prior to trial, Cartwright filed a motion in limine and during the trial, he timely objected to Kia and Aimire's testimony describing Cartwright's physical reaction to Aimire's accusations arguing that the evidence violated both Rule 403 and 404.

Section 27-404(2) provides that:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identify, or absence of mistake or accident.

But when determining whether to admit evidence under Rule 404(2), the Nebraska Supreme Court has held that:

". . . Rule 404(2) is subject to the overriding protection of Rule 403 of the Nebraska Evidence Rules . . . ." *State v. Craig*, 219 Neb. at 77, 361 N.W.2d at 213. See, *State v. Phelps, supra*; *State v. Jacobs*, 226 Neb. 184, 410 N.W.2d 468 (1987). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Neb. Evid. R. 403 (Neb. Rev. Stat. § 27-403 (Reissue 1989)). While most, if not all, evidence offered by a party is "calculated to be prejudicial to the opposing party," only evidence tending to suggest a decision on an improper basis is "unfairly prejudicial" and a concern under rule 403. *State v. Phelps*, 241 Neb. at 722-23, 490 N.W.2d at 688. See, *State v. Messersmith*, 238 Neb. 924, 473 N.W.2d 83 (1991); *State v. Lonnecker*, 237 Neb. 207, 465 N.W.2d 737 (1991). In summary, rule 404(2) requires a two-step inquiry. See *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978), cert. denied 440 U.S. 920, 99 S. Ct. 1244, 59 L. Ed. 2d 472 (1979). First, relevance of the evidence at issue is determined. Rule 404(2) permits admission of other acts evidence if it is relevant to prove some fact of consequence other than the defendant's bad character. See, *State v. Phelps*, supra; *State v. Timmerman*, supra; *State v. Clancy*, supra; *State v. Craig*, *supra*. Second, rule 403 requires a determination of

whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice.

*State v. Perrigo*, 244 Neb. 990, 997, 510 N.W.2d 304, 309 (1994).

In ruling on Cartwright's motion in limine, the district court determined that the testimony describing Cartwright's reaction following Aimire's accusations under Rule 404(2) was "inextricably intertwined with the circumstances making up the underlying allegations and is admissible." The court further found that the evidence was relevant and admissible for the limited purpose of showing identity, Cartwright's knowledge of the allegations, and Cartwright's state of mind. The court directed that "[n]o evidence of the particular statements made by Aimire prior to the physical altercation shall be elicited and no reference to any other allegations of sexual abuse by [Cartwright] on any other child shall be admitted." Cartwright does not challenge that determination on appeal. Instead, he argues that notwithstanding the evidence's limited relevance, the court erred in applying the second step of the analysis by failing to find that the testimony was unfairly prejudicial under Rule 403.

Because the admissibility of other acts evidence under Rule 404(2) is subject to Rule 403, we must consider whether the district court abused its discretion in finding that the probative value of Cartwright's physical reaction in assaulting Aimire after being accused by Aimire of sexual assault involving a different victim (L.B.) was not substantially outweighed by the danger of unfair prejudice or the other factors listed in Rule 403, such as misleading the jury, confusion of the issues, or undue delay. See Rule 403.

In *State v. Perrigo*, 244 Neb. at 1000, 510 N.W.2d at 311, the Nebraska Supreme Court stated:

> "'Probative value is a relative concept, the probative value of a piece of evidence involves a measurement of the degree to which the evidence persuades the trier of fact that the particular fact exists and the distance of the particular fact from the ultimate issues of the case.'" *State v. Bostwick*, 222 Neb. 631, 639, 385 N.W.2d 906, 912 (1986) (quoting Andrew K. Dolan, Rule 403: The Prejudice Rule in Evidence, 49 S. Cal. L. Rev. 220 (1976)). Accord, *State v. Messersmith*, 238 Neb. 924, 473 N.W.2d 83 (1991); *State v. Baltimore*, 236 Neb. 736, 463 N.W.2d 808 (1990). "In the context of Neb. Evid. R. 403, 'unfair prejudice' means an undue tendency to suggest a decision on an improper basis."

And more recently in *State v. Oldson*, 293 Neb. 718, 751-52, 884 N.W.2d 10, 41-42 (2016), the Nebraska Supreme Court held:

> Unfair prejudice speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged, commonly on an emotional basis. When considering whether evidence of other acts is unfairly prejudicial, we consider whether the evidence tends to make conviction of the defendant more probable for an incorrect reason.
>
> . . . .
>
> Balancing the probative value of evidence against the danger of unfair prejudice is within the discretion of the trial court, whose decision we will not reverse unless there is

an abuse of discretion. As one court said, "'Only rarely — and in extraordinarily compelling circumstances —will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect.'"

Applying that standard here, we first note that evidence of a suspect's reaction when first being accused of a crime is at least somewhat probative of the ultimate issue and bears to some degree upon the ultimate issue of whether the suspect did in fact perform the act of which the suspect was accused. As applied to Cartwright, we focus our analysis on whether the probative value of the evidence of Cartwright's physical reaction in assaulting Aimire following Aimire's allegations which included what he saw with a different victim was outweighed by the danger of unfair prejudice.

In reviewing the record, we first note that during the motion-in-limine hearing, the district court received into evidence the depositions of both Kia and the victim. In Kia's deposition, she testified that when Aimire confronted Cartwright, Aimire accused Cartwright of both sexually assaulting the victim and having observed a sexual encounter between Cartwright and L.B. As we mentioned before, the district court ruled that

> No evidence of the particular statements made by [Aimire] prior to the physical altercation shall be elicited and no reference to any other allegations of sexual abuse by [Cartwright] on any other child shall be admitted. The evidence that the Court has deemed admissible may be used for the limited purposes of showing identity, [Cartwright's] knowledge of the allegations, and the state of mind of [Cartwright].

As such, the district court found that the probative value of Cartwright's reaction to the accusations was not outweighed by the danger of unfair prejudice, but the court refused to allow any evidence that the accusation by Aimire included a separate reference to L.B.

During the trial, testimony about Cartwright's reaction to the accusations was presented to the jury during the direct examinations of Kia and Aimire. The following colloquy took place between the State and Kia:

Q. So you told [the victim] to speak up. She did not want to. What next? What did you do next?

A. I told Aimire to speak up.

Q. What did -- did Aimire?

A. No.

Q. What was his demeanor like?

A. He pushed [himself] back on the couch.

Q. While this was going on, what was [Cartwright's] demeanor like?

A. He was starting to get upset.

Q. So neither of the kids wants to speak up. At some point then, is [Cartwright] confronted about what [the victim] has said?

A. Yes.

Q. After he's confronted about that, what is the defendant's demeanor like?

A. In angry shock.

Q. An angry shock?

A. Yes.

Q. What do you mean by that?

A. Like, like, "What the" -- like, just shock. Like, "What? What? Who?" Yeah. Just -- it was just shock, but it was angry.

Q. Does he say anything?

A. He was talking. I don't recall exactly what he said at that moment.

Q. Did he do anything physically?

. . . .

A. He at first was talking and yelling. He was, like, basically argumentative about it. And then he physically grabbed my son; he grabbed Aimire, physically grabbed Aimire and hit Aimire and threw Aimire on the couch. And then he said some things to Aimire. And my dog jumped in front of Aimire to protect Aimire.

Q. Okay. I want to break that down a little bit. You said at first the defendant was kind of talking and yelling. Do you remember what he was saying?

A. Not exactly. It was pertaining to what was -- what he was told.

Q. Okay. Angry talking and yelling?

A. Yes.

Q. And you said then he grabbed Aimire and hit Aimire and threw him on the couch?

A. Yes.

Q. What did he do next to Aimire?

A. He yelled at Aimire in his face. He yelled at Aimire in his face; and he told Aimire, "If you ever tell anyone else that, I will kill you." And then he proceeded to tell me to get my dog because my dog was trying to attack him.

The following colloquy took place between the State and Aimire:

Q. Okay. Did they have a conversation about why [Cartwright] was there?

A. Yes.

Q. And during that conversation did you say anything?

A. No.

Q. Okay. What happened after they had their conversation?

A. He just, like -- he got mad and, like, he popped up and then, like, just put out -- got all his anger and, like, put it all off on me.

. . . .

Q. All right. The conversation that they had, at any point did you speak up?

A. Yes.

Q. Okay. And when you spoke up, without telling me exactly what you said, did your statement at that time have anything to do with your concerns about [Cartwright] and [the victim]?

A. Yes.

Q. Okay. Did your dad hear you speak up in that moment?

A. Yes.

Q. And after he heard what you said, what did he do?

. . . .

Q. After your dad heard that statement that you made, what did he do?

A. He jumped up out -- off the ottoman and then, like, picked me up and then punched me and threw me onto the couch and then walked -- and then walked out the house.

As demonstrated in Kia's deposition which was admitted during the hearing on the motion-in-limine, Cartwright's reaction was to Aimire's joint accusation involving both the victim and L.B., but it was presented to the jury as if Cartwright's reaction related solely to the accusation against the victim. And the evidence was presented in that manner because of the district court's prior ruling on the motion-in-limine that the State could not elicit any evidence regarding other acts involving L.B. But, as Cartwright argues, the characterization of events presented at trial distorts the testimony of Aimire and Kia and creates confusion regarding the nature of Cartwright's reaction. Thus, the question becomes whether the allowance of this testimony, over Cartwright's timely Rule 403 objection, was unfairly prejudicial to Cartwright. We find that it was.

In making this finding, we recognize that an accused's reaction to being confronted with an alleged crime is at least somewhat probative of the accused's guilt or innocence. And when the reaction itself results in a bad act, in this case Cartwright's assault of Aimire, that bad act could result in an unfair effect on the accused in relation to the probative value of the reaction itself. But standing alone, whether the probative effect of a suspect's physical reaction to an accusation outweighs the prejudice of the act itself is a matter which we need not decide. In this instance, Cartwright's reaction was to an accusation by Aimire that the victim told Aimire that Cartwright had sexually assaulted her along with an accusation that Aimire saw Cartwright engage in a sexual act with L.B. But when presented to the jury, Cartwright's reaction was presented as a reaction solely to an accusation involving the victim.

We agree that allowing the reaction to be presented this way was misleading to the jury and could result in juror confusion. It becomes merely speculation whether Cartwright was reacting to Aimire's accusation regarding what the victim disclosed, what Aimire stated he witnessed regarding L.B., or both. But because Cartwright's reaction was to a joint accusation, a portion of which the district court ruled was inadmissible, we find that the insinuation to the jury that Cartwright's reaction related solely to the accusation against the victim rendered the reaction itself less probative and resulted in a presentation of evidence which was unfairly prejudicial to Cartwright. Stated differently, because the manner in which the evidence was presented to the jury distorted the nature of what actually happened during Aimire's accusation and Cartwright's reaction, the evidence was misleading and could result in juror confusion. Under those circumstances, the evidence was unfairly prejudicial to Cartwright and the unfair prejudice outweighed its limited probative value. Under the circumstances of this case, because the district court had previously ruled that the State could not present evidence regarding other bad acts involving L.B., it was simply impossible to bifurcate Aimire's accusation and then fairly and

accurately present that Cartwright's reaction related solely to an accusation involving the victim. Allowing the State to do so over Cartwright's Rule 403 objection was an abuse of discretion. We next consider whether this error was harmless beyond a reasonable doubt.

As the Nebraska Supreme Court stated in *State v. Britt*, 293 Neb. 381, 423-24, 881 N.W.2d 818, 847 (2016):

> In a jury trial of a criminal case, an erroneous evidential ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt. We consider whether the erroneous admission of evidence is harmless beyond a reasonable doubt so that convictions are not set aside "for small errors or defects that have little, if any, likelihood of having changed the result of the trial."

Here, the sole evidence of sexual assault against Cartwright came from the testimony of the 5-year-old alleged victim who was 6 years old at the time of the trial. And as it relates to her allegation, she testified in her deposition that Cartwright did not assault her while her statements to the forensic examiner, medical examiner, and the victim's trial testimony stated that he did. And, as it relates to a description of sexual assault, the victim's description to the forensic examiner of what happened was substantially different than the victim's description at trial. The testimony also established that the victim confused 3 different individuals as being her "dad" and during her deposition stated it was a different person she referred to as her "dad" that sexually assaulted her. She further testified that Kia and Aimire helped her remember what happened and that someone would be upset with her if she did not testify that Cartwright assaulted her.

Given that evidence, there is an increased likelihood that the erroneously admitted evidence may have changed the result of the trial. See *State v. Britt, supra.* As previously noted, "[u]nfair prejudice speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged, commonly on an emotional basis." *State v. Oldson*, 293 Neb. 718, 751-52, 884 N.W.2d 10, 41-42 (2016). In the present case, evidence of Cartwright's assault of Aimire may have stemmed solely from an accusation unrelated to the present case of which the jury was not made aware. Cartwright's violent reaction, presented without full context, may have made Cartwright's conviction "more probable for an incorrect reason," *id*. at 752, 884 N.W.2d at 42, and thus not harmless beyond a reasonable doubt.

We further note that having allowed the testimony under Rule 404(2), Cartwright was entitled to a jury instruction limiting the scope of how the jury was allowed to consider such evidence. As the Nebraska Supreme Court stated in *State v. Oldson*, 293 Neb. at 750-51, 884 N.W.2d at 41:

> While, normally, the better practice is for a trial court to instruct the jury regardless of request, so as to ensure the evidence is not used for an improper purpose, the majority view is that the court does not have a duty to present a limiting instruction to the jury sua sponte. We have thus said that the failure to provide limiting instructions absent a request is not reversible error. Indeed, it may at times be a tactical decision by defense counsel not to highlight, through a limiting instruction, the evidence itself or the fact that the jury could infer from the evidence anything other than its proper purpose.

Here, no instruction was requested by Cartwright, nor did the district court give one. And even though the majority view is that the court does not need to present a limiting instruction to the jury sua sponte, we believe the lack of instruction bears upon the potential prejudice as it relates to the evidence that was erroneously allowed into evidence and not limited by an instruction. On this record, we cannot say that the admission of the testimony regarding Cartwright's physical reaction to the joint accusation of sexual assault related to two separate victims, presented as a single accusation against the victim at trial that was not given in full context and thus may have been misleading, was harmless error beyond a reasonable doubt.

Having found reversible error, we must determine whether the totality of the evidence admitted by the district court was sufficient to sustain Cartwright's conviction. If it was not, then concepts of double jeopardy would not allow a remand for a new trial. See, e.g., *State v. Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009). The Double Jeopardy Clause does not forbid a retrial so long as the sum of all the evidence admitted by a trial court, whether erroneously or not, would have been sufficient to sustain a guilty verdict. *State v. Rogers, supra*. We find that that the evidence other than Cartwright's reaction to Aimire's statements was sufficient to sustain the jury's verdict. We therefore reverse Cartwright's conviction and remand the cause for a new trial.

## 2. Error Related to Video-Recorded
### Forensic Interview of Victim

Cartwright next contends that the district court erred in receiving a recording of the victim's forensic interview into evidence during the trial over his hearsay objection. Although Cartwright's first assignment of error requires us to reverse and remand for a new trial, an appellate court may, at its discretion, discuss issues unnecessary to the disposition of an appeal where those issues are likely to recur during further proceedings. See *State v. Edwards*, 286 Neb. 404, 837 N.W.2d 81 (2013); *State v. Brooks*, 23 Neb. App. 560, 581, 873 N.W.2d 460, 478 (2016). Accordingly, because this issue is likely to recur during a new trial, we will consider whether the district court erred in admitting the forensic interview into evidence over Cartwright's hearsay objection.

In support of his claim, although recognizing that Neb. Rev. Stat. § 27-803(3) (Cum. Supp. 2024) provides that the hearsay rule does not apply to statements made for purposes of medical diagnosis or treatment, Cartwright argues the young victim did not possess the requisite understanding that the forensic interview was being conducted for that purpose which rendered her remarks subject to the hearsay rule.

The concepts raised by Cartwright were explained by the Nebraska Supreme Court in *State v. Jedlicka*, 297 Neb. 276, 285-87, 900 N.W.2d 454, 463-64 (2017*),* wherein the court held:

> Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted. A declarant's out-of-court statement offered for the truth of the matter asserted is inadmissible unless it falls within a definitional exclusion or statutory exception.
>
> Rule 803(3) provides that the hearsay rule does not exclude "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or

external source thereof insofar as reasonably pertinent to diagnosis or treatment." Rule 803(3) is based on the notion that a person seeking medical attention will give a truthful account of the history and current status of his or her condition in order to ensure proper treatment. In order for statements to be admissible under rule 803(3), the party seeking to introduce the evidence must demonstrate (1) that the circumstances under which the statements were made were such that the declarant's purpose in making the statements was to assist in the provision of medical diagnosis or treatment and (2) that the statements were of a nature reasonably pertinent to medical diagnosis or treatment by a medical professional.

In *State v. Vigil*, [283 Neb. 129, 810 N.W.2d 687 (2012)] we held that "statements made by a child victim of sexual abuse to a forensic interviewer in [the chain of medical care] may be admissible under rule 803(3) even though the interview has the partial purpose of assisting law enforcement's investigation of the crimes." We stated that the fundamental inquiry to determine whether statements, made by a declarant who knew law enforcement was listening, had a medical purpose is "'[i]f the challenged statement has some value in diagnosis or treatment, [because] the patient would still have the requisite motive for providing the type of "sincere and reliable" information that is important to that diagnosis and treatment.'" Nevertheless, the admissibility of dual purpose statements are still subject to the general two-prong standard used to determine admissibility under rule 803(3).

Cartwright does not contest the applicability of the rule because the victim's statements were made to a forensic examiner. Instead, he challenges the first prong of the standard and argues that because of the victim's young age and behavior, she simply did not demonstrate that she was aware that her statements were being made for the purpose of diagnosis or treatment. We disagree.

Under rule 803(3), there need not be direct evidence of the declarant's state of mind; instead, the appropriate state of mind of the declarant may be reasonably inferred from the circumstances. *State v. Jedlicka*, 297 Neb. 276, 900 N.W.2d 454 (2017*).* Determining if the circumstances warrant inferring the appropriate state of mind is necessarily a fact-specific determination. *Id.* Although rule 803(3) has now been recodified at 803(4), the language of the rule has not changed nor has the authority interpreting the rule.

Cartwright appears to argue generally that the victim did not demonstrate that she was capable of understanding that the purpose of eliciting statements from her was for the purpose of diagnosis and medical treatment. Generally speaking, the question of competency of a child witness lies within the discretion of the trial court, and that determination will not be disturbed in the absence of an abuse of discretion. *State v. Earl*, 252 Neb. 127, 560 N.W.2d 491 (1997). The district court found that both Eckstrom and Wright testified that they introduced themselves to the victim and explained that their purpose was to make sure that the victim was safe and healthy. The court further found that the victim's state of mind could be inferred from the circumstances when she was informed that she would be undergoing a medical examination and consented to it.

In *State v. Vaught*, 268 Neb. 316, 322-23, 682 N.W.2d 284, 289-90 (2004), the Nebraska Supreme Court stated:

- 14 -

[The doctor] testified in detail regarding the circumstances under which the victim made her statement. As described, those circumstances were such that the 4-year-old victim clearly understood that a medical examination was being performed, that the purpose of the doctor's questions was to assist in medical diagnosis and treatment and, thus, that the victim's statements were motivated by seeking treatment. [The doctor] testified that he had no concerns that the victim did not understand the nature of the examination, and his testimony indicates his state of mind was such that he reasonably relied on the victim's statement. [The doctor] also testified that there were valid medical treatment purposes for learning the identity of the perpetrator and that such purposes were pertinent to diagnosis and treatment. Such testimony by [the doctor] was sufficient to infer the victim's state of mind in making the statement.

Similarly, in this case, Wright testified that she informed the victim that she was going to complete a medical examination, and the victim agreed to the medical examination. Both Eckstrom and Wright testified that they introduced themselves to the victim, explained their roles, and told the victim that they were there to make sure she was safe and healthy. Both Wright and Eckstrom testified that the victim appeared to understand their questions and that the victim's demeanor and responses were age appropriate. Based on the circumstances, we find that there was sufficient evidence for the district court to conclude that the victim demonstrated an understanding of the purpose of the interview, that it was explained the interview was for the purpose of treating the victim, and that the statements in the victim's forensic interview qualified as statements made for the purpose of medical diagnosis or treatment.

## VI. CONCLUSION

For the reasons stated above, we reverse and remand for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.

- 15 -